## Dana Estate

500

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

501

502

504

506

508

*John B. Farr, Thomas S. Weary, Maurice Heck-scher*, and *Duane, Morris and Heckscher*, for except-ants.

*John E. Littleton, J. Pennington Straus* and *Schna-der, Harrison, Segal and Lewis*, contra.

KLEIN, P. J., August 4, 1954.—A single narrow but extremely important question is raised by these excep-tions: Was testator's final residuary gift vested or contingent? Our task is made more difficult by reason of the apparent lack of harmony in the many decided cases dealing with this subject.

Judge Hunter, the learned auditing judge, in a care-fully studied adjudication in which he analyzed at considerable length the pertinent authorities, con-cluded that the remaindermen who survived testator, but died in his daughter's lifetime, had vested interests subject to being divested if they died leaving issue. He held that the instant case is controlled by the principles enunciated in Carstensen's Estate, 196 Pa. 325 (1900). He also relied upon such cases as Neel's Estate, 252 Pa. 394 (1916); Lloyd's Estate, 326 Pa. 230 (1937), and Rickenbach Estate, 348 Pa. 121 (1943).

Exceptants, on the other hand, maintain that the remainders are contingent and that Rosengarten v. Ashton, 228 Pa. 389 (1910) controls. They also con-tend that Hood's Estate, 323 Pa. 253 (1936), Al-burgers' Estate (No. 2), 274 Pa. 15 (1922), and many

other cases cited in their comprehensive briefs, support their position.

After a careful study of the matter, the majority of the court is in agreement with the auditing judge, and it will serve no useful purpose to repeat here in extenso what has been so fully and carefully discussed in the adjudication.

It is one of the basic rules of construction, early embodied in our law, that, in the absence of a clear expression of contrary testamentary intent, the immediate vesting of future interests is favored. We find no such contrary intent in the present will.

Six times in his will and codicil testator demonstrated that he knew precisely how to make survival of a given event a prerequisite to taking. Thus, in paragraph 3, he used the expression, "to her issue if she had any living at her death". In paragraph 13, and three times in paragraph 14, testator refers to his daughter's "living issue at her death". He used similar language in item 2 of his codicil. Testator's failure to attach the condition "if living" to the alternative gifts in remainder is therefore crucially significant and leads persuasively to the conclusion that testator intended the disputed gifts to be vested: Brumbach Estate, 373 Pa. 302 (1953); Bomberger Estate, 347 Pa. 465 (1943).

Testator's general testamentary plan follows the usual and customary pattern adopted by family men for the protection of their wives and children. He established life estates for his wife and daughter and gave the daughter the right to appoint the principal by will to her children or other issue and in the absence of such appointment to such issue absolutely and in fee simple. The gift to the brothers and sisters of testator's father or their issue is a substitutionary plan to be invoked only if testator's primary plan fails because of the death of his daughter without issue. It is obviously a catch-all to prevent an intestacy.

Testator certainly gave no indication that he was particularly concerned with the manner in which his estate would be ultimately divided among his collaterals, if his own line ended with his daughter's death. We cannot now, almost 50 years after the will was written, conjure an intention which would be most agreeable to the circumstances which actually developed, but which testator manifestly did not foresee or anticipate and which apparently disturbed him little. See Jacob's Estate, 343 Pa. 387 (1941) ; Morrison Will, 361 Pa. 419 (1949). It is not the province of the court to construe what testator possibly intended, nor what the court thinks he might or should have said in providing against the circumstances which eventuated. We can only construe the language he actually used: Conner's Estate, 346 Pa. 271 (1943), and Britt's Estate, 369 Pa. 450 (1952).

We cannot agree with exceptants that the "pay and divide" rule must be applied in the present case and the gifts in remainder held to be contingent. Nor do we agree with them that such cases as Wilson Estate, 369 Pa. 583 (1952), Edmund's Estate, 374 Pa. 22 (1953), and McCrea Estate, 78 D. & C. 154 (1951), are controlling. In our opinion, enjoyment of the gifts in remainder was postponed to let in the intervening life estates for the benefit of testator's widow and daughter: Rickenbach Estate, supra. We believe, further, that we must attribute to testator, in construing the language he used, an intention which conforms to the well-established principle favoring the immediate vesting of future estates.

The exceptions are dismissed and the adjudication is confirmed absolutely.

### DISSENTING OPINION

SHOYER, J., August 4, 1954.—I am so strongly convinced that Charles E. Dana intended that none but *living* collaterals should enjoy his residuary estate,

that I must dissent from the majority of my brethren.

Testator died February 1, 1914, leaving a will dated November 23, 1908. He was survived by his wife and daughter, and the latter survived her mother until her death without issue on April 30, 1953.

In the fourteenth item of his will be created a residuary trust for the life of his wife, and after her death for the life of his daughter, Millicent, and then he provided for the termination of this trust as follows:

"After the death of my said wife and daughter if my said daughter leave children or their issue living at her death, then my said trustees are to assign, transfer and convey the principal of my estate to such persons and for such purposes as my said daughter shall by her last will direct and appoint, or in the default of such a will to said issue absolutely and in fee simple."

As has been stated, Millicent W. Dana, testator's daughter, died without issue, and the above provisions were without effect.

The will continues:

"But if my said daughter shall leave no children or their issue living at her death, then my said Trustees after my wife's death and that of my daughter shall pay . . ."

Then follow eight pecuniary legacies to charity, including one by codicil.

The final residuary gift, which is the one in controversy, is as follows:

"The residue of my estate to be divided among the brothers and sisters of my father Edmund L. Dana or their issue, the said issue to take per stirpes."

Testator's grandfather had married successively two sisters, by the first of whom he had eight children, and by the second, seven children.

Testator's father thus had seven full brothers and sisters, and seven half brothers and sisters, 14 in all.

At the date of testator's will, nine of his aunts and uncles were dead, five with issue and four without issue. I believe that this fact, viz., that a majority of the original members of the class were then deceased, presents a situation unique among the decisions reported by our appellate courts. Its implications are both manifest and far reaching. They should be given effect in construing his will.

Of the five uncles and aunts still living in 1908, only one had issue and all of them were of the half blood. At the time of testator's death in 1914, his uncle Eleazar had died without issue, leaving Anderson Dana, Frances Dana Miller, Helen Dana Mills and Mary Dana Piatt, and the issue of Frances Dana Miller to survive. Frances Dana Miller, above named, died in 1916, leaving one child, Frank D. Miller, Sr., who died in 1938 leaving three children, William P. Miller, Louise M. Simpson and Frank D. Miller, Jr. (hereafter known as the Miller issue). The other three uncles and aunts who survived testator, died before Millicent without issue, but two of them, Anderson Dana and Helen Dana Mills, left wills giving their estates to their nephew, Frank D. Miller, Sr. The Miller issue thus claim three stirps, one through their grandmother, Frances Dana Miller, and two others through Anderson Dana and Helen Dana Mills. Issue of the other uncles and aunts oppose this contention, holding that only by surviving to the time of the death of testator's daughter, Millicent, are the issue entitled to take, thus reducing the stirps to six instead of nine.

Certain principles to be applied in the interpretation of wills are axiomatic. The will must be read from its four corners: March Estate, 357 Pa. 216 (1947); in the light of the testamentary scheme: Walker Estate, 376 Pa. 16 (1954); and in the light of the circumstances surrounding testator when he made his will: Fahey Estate, 360 Pa. 497, 500 (1948).

The importance of these considerations is that they provide the keys to testator's *intent*, which is the "pole star" of the court in interpreting wills: Lyman Estate, 366 Pa. 164 (1950). The circumstances here cannot be ignored.

Observing the above facts from the vantage point of testator's armchair, one can readily recognize that the problem before the court is to determine whether Charles E. Dana intended that in the event his daughter died without issue, his estate should be distributed to his collateral relatives living at his death, although they predeceased his daughter, or that his estate should go only to those of this group of relatives who were living at the time of distribution and could, therefore, enjoy the bequest themselves. In solving this problem, one may state as a truism, with probably no exception, that the only tenable reason for giving property to the estate of a deceased person is to give the deceased person a power of disposal over the property.

The question then suggests itself, why would Charles E. Dana have intended, in the bequest he made, to give any deceased persons a power to dispose of some of his estate? One thing is clear: The reason was not to provide for the living issue of any such deceased class member; testator himself included such issue in his gift. Therefore there could be only two reasons for such an intent on the part of testator: (1) To enable the deceased person to take the property out of testator's blood line, or (2) to enable the deceased person to alter the stirpital scheme of distribution among testator's relatives that testator himself had desired. And, of course, the negative side of such an intent of testator would be that he wanted his deceased collateral relatives to control the disposition of his property for the above two purposes rather than disposing of his property himself. To merely state this latter proposition is sufficient of itself to show its lack of substance.

That this testator had no such intent is made completely clear by the facts of this case. When testator died, only four of his uncles and aunts were living; they established four of the nine stirps of relatives as of that date. Of these four, three, Anderson Dana, Helen Dana Mills and Mary Dana Piatt had no issue. Furthermore, they were then aged 79, 77 and 64, respectively. Therefore, two things were unmistakable: These three persons would most surely die without issue and, in all likelihood they would be dead 30 or 40 years before the life tenant died and the property was distributable. Testator *knew* these facts. Therefore, in holding that the class of remaindermen was determined as of testator's death, the majority have held, in effect, that Charles E. Dana *intended* to give to these three half uncles and aunts the power to dispose of a full one third of his entire estate, and further, that he gave them this power for the purpose either of taking his property out of his own blood line, or for the purpose of having these three persons vary, drastically, the stirpital scheme of distribution he himself had prescribed among the other relatives of testator, most of whom were distant relatives of the three persons in question.

Undoubtedly, testator intended the living issue of his five then deceased uncles and aunts to take. He did not intend any interest to go to those who had already died without issue and there is no more reason to suppose that he intended to benefit those living at the date of the will, who might thereafter predecease either him or the life tenant, but leave no issue to survive.

When testator signed his will he was 65, 38 years older than his 27-year-old unmarried daughter. It is vain to think that he contemplated her death before his as more than the slimmest possibility. If he refused to her, to whom he was so closely bound, the power of

transmission (except if she left issue) and also to her issue if they should predecease her, then what conceivable reason would induce him to think he should give this power of transmission to Uncle Andy or Aunt Helen dying without issue in the life tenant's lifetime?

Testator's primary interests were obviously his wife and daughter. There is no reason to believe he intended to *primarily* benefit his five living uncles and aunts of the half blood, any more than he intended to benefit those of full blood already dead without issue. There is not a scrap of evidence to show that he preferred one or more members of the class to the others, or who they were, if such was indeed the case. He calls none of them by name (as in Packer's Estate (No. 2), 246 Pa. 116, 124, 125 (1914)), but refers to them clearly and concisely as a class. The general rule of class gifts, therefore, should apply, i.e., that the class should expand or contract till vesting in possession takes place. See the dissenting opinion of Mr. Justice Mitchell in Carstensen's Estate, infra.

If his blood line were to continue, he doubtless trusted his daughter to transmit to her issue in the absence of some very compelling reason (e.g., notorious immorality, insanity or extreme improvidence) why they should not inherit. The will does show his confidence in her to this extent, which is more confidence than he has expressly placed in anyone else. But if the daughter lacked issue, he did not trust her to appoint, though he might have given her a special power, under which she could have preferred certain collaterals to the exclusion of others. What reason is there for thinking that he would prefer his half uncles and aunts to exercise such preference rather than his own daughter? The answer is "none".

The present case is virtually identical with a case recently decided by this court, McCrea Estate, 78 D. & C. 145 (1951). There testator created a residuary

trust with the income payable to his wife for life and then to his two daughters for their lives. Each daughter was given a testamentary power of appointment if she left issue, with a gift in default of appointment to issue, and provided for cross remainders if either died without issue. The will then went on to provide:

"In the event of the death of my wife and of both of my children without children or descendants of children, then I direct my said Trustees that they divide my estate into three equal shares and transfer and convey one such share to my sister, Anne P. Wirgmann or if deceased to her descendants, another such share to my sister Mary M. Smith or if deceased to her descendants, and the remaining such share unto and among the children of my late brother Henry McCrea and their descendants, 'per stirpe'."

Both of the daughters died without issue so this paragraph became effective. This court held in a unanimous opinion that the remaindermen had to survive until time for distribution of the principal in order to take.

It is not reasonable to assume that testator wanted all, or even one third, of his property to go to the estates of deceased persons.

"The exclusion of the estates of deceased persons is the ordinary intention of a testator": McCrea Estate, supra, at page 151. He could confer no benefit on them individually; he could, however, confer a benefit on the lineal descendants of those living at his death who would be alive to enjoy his bounty. It is reasonable to assume that this is what he intended and the words of the gift are designed to accomplish just that.

The testamentary scheme in the will is consistent only with requiring survival until the time for distribution. The primary objects of testator's bounty were his wife and daughter and lineal descendants. The words "take effect" were used twice in the will (items 13 and 14) to emphasize this *absolute prefer-*

*ence.* He had no desire to benefit his collateral relatives; their gift was in the nature of an "if all else fails" proposition. It is inconsistent with this testamentary scheme to say testator intended to make a present gift at his death to his collateral relatives. The learned auditing judge himself recognized this at one point in his adjudication, when he said:

"The testamentary plan of this testator was to postpone all *gifts* of principal until the deaths of his widow and daughter, and to condition his benefactions upon the death of his daughter without issue." (Italics supplied.)

The testamentary plan was to carry the property down testator's blood line as far as possible (see Hood's Estate, 323 Pa. 253, 258 (1936)), and, when his line died out, and *at that time only* did testator think in terms of other individuals to whom he might wish to give his residuary estate. This was the focal point in time in the testator's mind with regard to his gift to the collaterals, and the gifts then made were to be in accordance with the facts as they existed at that time. There is nothing which indicates testator intended that at that time there should be a reference back to the facts that existed at his death.

The beneficiaries of the gift over were described as follows: "The brothers and sisters of my father or their issue." It is clear that this is the description of a single class, that the persons who meet this description must be *determined at some particular time,* that the gift *vests* in these class members *at that time,* and *there can be no substitution of anybody's interest* after that time. If the brothers and sisters of testator's father are living at that time, they take; if they are deceased at that time, those who come within the class of their "issue" at that time take. This is the case of alternative takers, not substitutionary takers.

In analyzing the nature of this gift, Rosengarten v. Ashton, 228 Pa. 389, 395 (1910), is precisely in point.

In that case testator left half of his estate in trust for the lives of his children and then provided:

"On the death of the last of my children then to pay over and distribute said trust estate equally *to and among all my grandchildren and the issue of such as may be dead*, such issue to take the share the parent would have taken if living at the time of the death of my last surviving child."

The court said:

"The testator directs what is to be done with what remains of his estate upon the death of his last child. He directs who shall take directly from him, and, while he does not expressly say that they are to be grandchildren then living and the issue of those dead, no other intention is to be gathered from his words, unless we deny them their ordinary meaning, in which sense the law presumes the testator used them. No share is given to the estate of a deceased grandchild. The condition of participation in the distribution is life at the time it is to be made. Living grandchildren and living issue of deceased grandchildren are to be the distributees. They constitute the exclusive class to which the testator declares his estate shall go. The issue of a deceased grandchild shall take 'the share the parent would have taken if living' at the time of distribution. Could words more clearly indicate the intention of the testator that a grandchild shall take only if living at the time of the death of his last child? And if a living grandchild will take only at that time, by the express words of the testator, it cannot take before. It surely would be a work of supererogation to dwell longer on the expressed intention of the testator."

To the same effect is Hildebrant's Estate, 268 Pa. 132 (1920).

Another case precisely in point is Hood's Estate, supra, at p. 258. In that case there was a gift over to "issue", "and in default of such issue, then to the

survivors among my said *children or their issue as the case may be*". (Italics supplied).

This manifestly is the description of a single class determined at a single time. The gift was in trust for testator's daughter, Mary, for life, with a gift over. Of this gift over the court said:

". . . the direction 'upon her death [Mary's death] to pay over and transfer and assign the principal thereof . . . to my surviving *children and issue* in equal shares per stirpes' means to pay it over to those who are living, therefore in being to receive it, at the death of the life tenant." (Italics supplied.)

To precisely the same effect is Alburger's Estate (No. 2), 274 Pa. 15 (1922).

The Dana provision is not at all the same as the wills in such cases as Carstensen's Estate, 196 Pa. 325 (1900), and the dissimilarity emphasizes the correctness of our holding.

In the Carstensen provision the class of beneficiaries is quite clearly the testatrix's brothers and sisters. The direct gift is made to them. There is only a substitutionary gift to issue; to the issue of any brother or sister then dead. As the court said of this case in Adams' Estate, 208 Pa. 500, 503 (1904):

"The gift to the brothers and sisters was in absolute terms, with no condition that they should be living at the death of the husband, the tenant for life; and there was simply an alternative limitation, that if a brother or sister should be then dead, but leaving issue, his issue should be substituted to his interest."

Testator himself could, and did, make provision for his property to go to the living issue. He himself expressly specified that he wanted stirpital distribution. The presumption is that testators desire stirpital distribution, because of its inherent fairness. See Mayhew's Estate, 307 Pa. 84, 91 (1932). It is unreasonable and contradictory to assert that testator intended

to give deceased persons a power of disposal over his property so as to vary his scheme of stirpital distribution. Testator had no desire for deceased persons to take his property out of his blood line for reasons we have heretofore set forth. To say the very least, such a construction is out of harmony with the probable intentions of the ordinary testator; it must be deemed to be highly unreasonable, and "a construction that would lead to a highly improbable result is to be avoided, if at all possible; and a meaning conformable to the testator's plausible intent should be ascribed to his words if agreeable to reason: Riegel v. Oliver, 352 Pa. 244, 247, 42 A. 2d 602": Fahey Estate, 360 Pa. 497, 500 (1948).

The conclusion that testator desired that his property should go to those whom he had designated and on the basis of stirpital distribution is fully in accord with testator's language and is conformable to the common intention of testators in this situation. See, for example, the Act of June 29, 1923, P. L. 914, which provides that gifts of remainders to heirs after life estates should be interpreted to mean heirs determined as of the date of the death of the life tenants. As the court said in Laughlin's Estate, 336 Pa. 529, 536 (1939):

"This Act does not apply to the interpretation of the will now in controversy, whose maker died in 1919, but it is here referred to as a legislative establishment of a statutory presumption, and it is reasonable to believe that this presumption is 'a conclusion firmly based upon the generally known results of wide human experience:' See Watkins vs. Prudential Ins. Co., 315 Pa. 497, 504, 173 A. 644."

The nature of the class of beneficiaries also supports the conclusion that the property was to go to living persons designated by testator. This was not a gift to individuals, but to testator's relatives generally. It was to span various generations. Both at the time

testator wrote his will and at his death, there were a large number of persons within the class description. In making a gift of this type and under these circumstances, testator was not intending to make a gift to particular individuals, i.e., those living at his death. In this respect the contrast is sharp between this type of gift and a gift to one's brothers and sisters (see Carstensen's Estate, supra, and Neel's Estate, 252 Pa. 394 (1916)), all of whom are actually living at testator's death.

### Controlling Rules

The various rules of construction controlling here are set forth in the recent decision of this court in McCrea Estate, supra.

The first of these rules of construction is the familiar "pay and divide" rule. The language in the Dana will is the perfect example of this rule. The only gift to the collateral relatives is contained in this direction of testator:

"The residue of my estate to be divided among the brothers and sisters of my father Edmund L. Dana or their issue, the said issue to take per stirpes."

There is no independent gift of the residue whatever; simply the direction to divide it among a specified class of people. In a host of cases from Moore v. Smith, 9 Watts 403 (1840) to Edmund's Estate, 374 Pa. 22 (1953), this principle has been applied to the language contained in the Dana will.

In perhaps the leading case on the point, Rosengarten v. Ashton, supra, the language is the exact counterpart of that in the Dana will, as is also the language found in Wilson Estate, 369 Pa. 583 (1952). In that case the court said, at page 586:

"We are in unanimous accord that we need not go beyond the will itself to determine this question. Upon the death of the life tenant the will directs that the '. . . principal of my Estate . . . shall be divided

*equally among my next of kin under the Intestate Laws
of the State of Pennsylvania.'* (Italics supplied). Such
a direction is a 'pay and divide' provision and consti-
tutes a *contingent,* and not a vested, remainder in the
next of kin."

Both the Rosengarten case and the Wilson case are
entirely controlling on the point here involved. So are
each of the following cases: Edmunds Estate, supra;
Hood's Estate, supra; Alburger's Estate, supra; Mc-
Crea Estate, supra, and many others.

None of the recognized exceptions to the "pay and
divide" rule is applicable in the instant case.

It seems patent that there was no postponement of
the gift for the convenience of the fund, as in Ricken-
bach Estate, 348 Pa. 121 (1943), where the property
was given in trust solely for the purpose of allowing
the trustee to liquidate it (it being real estate) at the
most favorable price.

No more was there a postponement in this Dana will
to let in some other interest. The distinction here is
whether there is a present gift with enjoyment post-
poned to let in another interest or whether *the gift
itself is postponed to a future time.* In the Dana case
the *gift* to collaterals had to be postponed because,
unless testator's daughter died without issue, there
would not be any gift. There was no present gift to
the collaterals with enjoyment only postponed, to let
in the life estates of the widow and daughter.

The cases relied upon in the adjudication, viz., Jen-
nings' Estate, 266 Pa. 60 (1920), and Lloyd's Estate,
326 Pa. 230 (1937), are entirely different. In both of
those cases the gift was income to testator's wife for
life and at her death the *principal to testator's children
and issue of deceased children.* Clearly the only pur-
pose of postponing the interest of testator's children
was to give the income to the wife for life; there was
no necessity for postponing the gift, only the enjoy-
ment of the gift.

A second rule of construction supports our interpretation, namely, that where the class gift contains alternative takers in the nature of "heirs", "descendants" or "issue", such as "uncles and aunts or their issue", the class members must survive until the time of distribution.

In Feeney's Estate, 293 Pa. 273 (1928), testator put his property in trust to pay the income to his son for life, and then to his grandchildren for their lives, and at the death of each grandchild, its share "shall be paid to the residuary legatees or their heirs", the residuary legatees being those named in testator's will.

The court held that the gift to residuary legatees or their heirs was contingent. The court said, at page 282:

". . . when testator said, in the particular paragraph now before us for construction, that the estate was ultimately to be paid to his 'residuary legatees or their heirs,' it is evident he meant that the heirs of such residuary legatees were to take as substitutionary legatees if the named legatees themselves were not alive to take at the death of the children of the life tenant, respectively. *The testator may well have anticipated that the six residuary legatees specifically named by him might not be alive at that time, since all of them were a generation older than those who must die, after the death of the first life tenant, before the interest of such legatees would accrue.*" (Italics supplied.)

See also Bauman v. Bauman, 63 D. & C. 681, 693 (1948), and Bernard Estate, 351 Pa. 313 (1945).

This rule is not restricted to wills containing the word "heirs", for this court has held that it applies in the case of "descendants", a word which carries the same connotation as "issue".

Thus as was said by this court in McCrea Estate, supra, at page 159:

"The conclusion that 'descendants' is a word of purchase and that distribution is to be made to descendants stirpitally, necessarily carries with it the conclusion that only persons living at the termination of the trust are entitled to share; that is, that the estate of any person dying before the last surviving life tenant has no interest, and that the devisee of any person so predeceasing the last life tenant has, likewise, no interest."

In its opinion, the majority takes the position that all the evidence of intent in and around the will is rebutted by the fact that testator specifically inserted the words "then living" in referring to issue of his daughter but did not in making the gift to collaterals, on the authority of Bomberger Estate, 347 Pa. 465 (1943), and Brumbach Estate, 373 Pa. 302 (1953). I believe this emphasis is misplaced for two reasons. Testator was uneven in his use of the words "then living". Sometimes he inserted them and sometimes he did not. Therefore, no inference can be drawn from the fact that the final residuary gift is one place he left it out.

To illustrate the first point I quote the last two sentences of item 3 of the will:

"After her death I give and bequeath the said articles to my daughter Millicent for her life and after her death to her issue if she have any *living at her death*. If, however, my said daughter Millicent shall die *without issue living at her death*, then after the death of my said wife and daughter, I make the following bequests and provisions." (Italics supplied.)

Then in the last paragraph of item 13, testator uses the expression: ". . . if my daughter Millicent die *without leaving issue at her death*", and likewise, in the first sentence of item 2 of testator's codicil: ". . . in the event of the decease of my daughter Millicent *without leaving any lineal descendants. . . .*" (Italics supplied.)

These several quotations have the identical purpose and meaning, although expressed in nonidentical language. In some testator inserted the words "then living" or their equivalent and in the others he did not. Mere failure of testator to use the words "living" or "then living" does not preclude him from intending survivorship by the use of equivalents.

It is easy to follow testator's line of thinking and his use of words. In the situation where testator inserted the words "then living" everything turned on this very point, viz., whether his daughter would leave issue surviving her. If she did, testator's property went one way; if she did not it went another way. But in the general gift over to collateral relatives, there was no special reason for testator to insert carefully the words "then living". The direction to divide the fund among the large group of "uncles and aunts or their issue" carried with it in testator's mind the necessity of survivorship, i.e., that you cannot divide property among dead persons, that only living persons can receive it: Hood's Estate, supra, at p. 259. This fact is the very root of the "pay and divide" rule. This being true, it was only natural for testator to omit the words "then living".

Secondly, Bomberger Estate, supra, relied on by the majority, does not apply in a "pay and divide" situation, of which this case is the very prototype, or in any similar situation. This is made clear by the cases Bomberger cites as the source of its principle.

Bomberger decided but one thing, viz., where the condition of survival is attached to the interest of the first taker you will not imply from *that fact alone* that the interest of the second takers is also conditioned on survival. Where, however, there are other factors which show the interest of the second takers is conditioned on survival (and there are many in this case), this condition of survival will be enforced though, of

course, testator did not expressly use the words "then living". This conclusion is also brought out in Carstensen's Estate, supra, also cited in Bomberger. Furthermore, Rosengarten v. Ashton, repeatedly approved by the Supreme Court to this day, is flat authority for this proposition. In that case testator used the words "then living" in connection with the interests of prior takers and did not in the gift to the ultimate remaindermen. The court held the interests of the ultimate remaindermen were, nevertheless, conditioned on survival until the time for distribution.

The points at which the Carstensen will differs from the Dana will are the very points singled out by our Supreme Court in Neel's Estate, supra, at page 405, in distinguishing Carstensen from Rosengarten v. Ashton:

"As said by the present Chief Justice in Rosengarten v. Ashton, 228 Pa. 389, at page 396, in distinguishing Carstensen's Est., supra, *'the brothers and sisters of the testatrix were in esse at the date of her death,* and the time when they were to come into possession of their legacies was fixed by the will, to wit, at the death of Edward Carstensen (here, Adella Neel) ; . . . the bequest was not qualified but absolute and immediate; there was no condition precedent attached to the gift which the legatees were required to fulfill prior to receiving the bequest; the time fixed by the testatrix for the enjoyment of the ulterior interests in her estate was not annexed to the legacies themselves and was in no sense a part of the description of the objects of her bounty; and it was evident that the only object of the testatrix in the postponement of the distribution of the estate among her brothers and sisters was a desire that she had to give her husband (here, her daughter) a life interest in it.' *If it were not for the substitutionary clause above quoted,* there could be no question raised but that the interests

taken by the brothers and sisters were vested, quodam modo, at the death of the testatrix, subject to be divested should Adella die leaving children her surviving (Packer's Est., supra); and, under the rule in Carstensen's Est., supra, it is clear that the substitutionary clause did not change this condition of affairs, but merely added another contingency, the happening of which might defeat the estate taken by any one of the brothers and sisters." (Italics supplied.)

Neel's Estate, itself, also is distinguishable. In that case testatrix left her estate in trust for her daughter for life with the principal payable at her death to her issue, and then as follows, page 402:

"And in case that the said Adella shall not leave at her decease any child or child of such deceased child, then in that case, *I will, devise and bequeath* (the principal) *to* and among *my brothers and sisters*, share and share alike, the children of any now or then deceased brother or sister to represent his or her parent and take the share he or she would take if living." (Italics supplied.)

The words of this gift are, of course, entirely different from the words of gift in the Dana will, as admitted by counsel for the Miller issue in his brief.

In addition, there is in Neel's Estate a most significant fact. Adella, the life tenant, was mentally defective, as expressly noted by our Supreme Court on page 405.

The presumption in favor of early vesting has no application here because (1) testator has clearly expressed his intent to postpone the determination of the members of the class until the death of the life tenant; (2) our decisions hold that any need for use of the presumption is considerably weakened when the gift is to collaterals rather than testator's issue, and (3) the motivation for use of the rule, viz., to pass along testator's estate to living issue, has been accomplished by testator himself by express provision in his will.

My conclusion is that testator intended that only such of the remainder beneficiaries as were living at the date of his daughter Millicent's death should participate in the distribution of the principal and accrued income of the trust and, therefore, the exceptions should be sustained.

Saylor, J., concurs in this dissent.